## WILSON et al. v. CALVERT.
### Civ. No. 596.

United States District Court
D. Arizona.

March 30, 1951.

Richard H. Chambers, Tucson, Ariz., for plaintiffs.

Edward W. Scruggs (Scruggs, Butterfield & Rucker), Tucson, Ariz., and Le Roy B. Lorenz, Los Angeles, Cal., for defendant.

McCOLLOCH, District Judge.

Defendant, a California contractor, was co-owner with plaintiffs of some acreage near Tucson, Arizona. For reasons not disclosed at the trial, the parties desired to abandon their joint operation, and the following letter proposal was made by defendant and accepted by plaintiffs:

"Los Angeles 22, California
"August 16, 1950

"Mr. Louis A. Wilson
"5500 Camino Real
"Tucson, Arizona
"Dear Mr. Wilson:

"I am willing to enter into an agreement with you and Mrs. Wilson as follows:

"You are to convey to me an undivided one-half interest in the unsold lots in Rincon Ranch Estates No. 1, being the south one-half of Section 25, Township 14 South, Range 15 East; also the northeast one-quarter of said section; also Section 30 (except the southwest Quarter of the southwest quarter thereof), Township 14 South, Range 16 East, all in Pima County, Arizona, except that portion of the above-described property which is designated on the Rincon Ranch Estates Advertising Circular as 'Lot twenty (20)'. Said 'Lot Twenty' is to be surveyed by a duly licensed surveyor, who is to stake out the lines following center line of Tanque Verde Trail, prepare a plat showing the lot and adjoining roads and trails and prepare a legal description of said

lot, all of which are to be subject to the written approval of both parties. All of the costs of the survey to be paid for by the grantees.

"I am to convey to you two, as joint tenants, an undivided one-half interest in said parcel referred to as 'Lot Twenty.' This deed shall contain a provision by which the grantees, by placing the deed of record, agree, for themselves and all subsequent owners of such property, that the use of said Lot Twenty is to be subject to all of the restrictions and conditions then affecting the use of any part of Rincon Ranch Estates, so far as such restrictions and/or conditions may be applicable to any portion of said Lot Twenty. I will assume and pay the balance of $3,000.00 on the Stovall note and mortgage, now held by Nicholson.

"Each party will furnish the other with a policy of title insurance as to the property by him conveyed, *showing such property to be free of encumbrances except conditions and restrictions placed thereon by the parties to this agreement and subject to taxes a lien but not yet payable, such taxes to be prorated as of close of escrow.* (Italics added).

"It is understood that the owner or owners of Rincon Ranch Estates will not be under any obligation to supply you or any future owner or owners of said Lot Twenty with water or any other facilities or utilities or services whatsoever.

"I will deposit in Escrow (1) the sum of $3,650.93, (2) a Satisfaction of Mortgage securing your note to me, (3) the said Mortgage Note marked 'Paid in full', (4) a Statement of all of your indebtedness to me which appears on my books marked 'Paid in Full', (5) Bill of Sale conveying to you one Northwest Shovel bearing Serial Number 2817, with all of the attachments, including pile driving equipment, all of which personal property is sold 'as is and where is'.

"Each party to pay for title policy covering property sold by him, his own recording fees and one-half of escrow fee.

"If the foregoing meet with your approval, you both will please indicate your approval by signing below and returning two to me, retaining one copy for your file. Then I'll send one executed copy to the title company and the escrow will be started.

> "Yours very truly,
> "Bert Calvert
> "By: (Signed) Bert Calvert

"Approved Aug. 16, 1950.
" (Signed) Louis A. Wilson
" (Signed) Florence E. Wilson

"This agreement is conditional upon Nicholson releasing from the mortgage the acreage involved in above described Lot 20 or accepting payment in full for balance due and releasing the mortgage.

> " (Signed)  Bert Calvert
> _____
>            Bert Calvert
> " (Signed)  Louis A. Wilson
> _____
>            Louis A. Wilson
> " (Signed)  Florence E. Wilson
> _____
>            Florence E. Wilson"

In due course, the Title Insurance Company, which had been employed to close the transaction, made the usual preliminary report, which contained the following paragraph 4 under "Continuation of Encumbrances", subhead, "Requirements": "4. W. A. Jackson has filed amended notice of Mining Location upon Claim designated as Five Jacks, formerly Dixie Bell, located within the northeast quarter of Section 30, Township 14 South, Range 16 East, Pima County, Arizona, according to instrument dated December 3, 1949 and recorded December 5, 1949 in the office of the County Recorder of Pima County, Arizona, in Docket 213 at page 330. If it is necessary that such claim be removed of record, then said W. A. Jackson and his wife, if married, must execute and have recorded proper instrument releasing said claim, otherwise same will be shown on policy of title insurance as an exception."

Upon receipt of word from plaintiffs that the preliminary report had shown the existence of a mining location on their mutually owned property, defendant "blew up". He wrote to plaintiffs:

"I note what you say about the mining claim, and it is beyond me to understand how anyone could file a mining claim on private property, and if he can make this

mining claim stick, I don't think the property is worth very much for building purposes as you would never know when somebody would file a mining claim in your front yard. If that is a universal situation in the State of Arizona, I will file a mining claim on your back yard the first time I come over.

"I don't think there is much I can do until I get their report, however, I will contact you as soon as I have further information."

Defendant then wrote the Title Company as follows:

"Los Angeles 22, California
"Sept. 1, 1950

"Tucson Title Insurance Co.
"45 West Pennington Street
"Tucson, Arizona

Re: Escrow No. 95784
"Calvert-Wilson

"Gentlemen:

"I have your letter of August 31, 1950, and it is my opinion that you can not comply with the Escrow instructions; and until you can comply with the Escrow instructions, I would suggest that you do not proceed to prepare papers.

"I paid for a title insurance policy from your firm at the time I took the mortgage on the said property in question and there was no report at that time of any mining claim. *However, the accompanying notice would indicate that the mining claim had been filed previous to that transaction*, and until the mining claim matter can be cleared up, I have no interest in any papers of conveyance.

"Yours truly,
"Bert Calvert
By: ————"

"BC:cj

Defendant wrote the further letter:

"Los Angeles 22, California
"Sept. 16, 1950

"Tucson Title Insurance Company
"45 West Pennington Street
"Tucson, Arizona

Re: Escrow Calvert-Wilson
"Order No. 95784

'Gentlemen:

"Acknowledging receipt of your favor under date of September 6th, I note that your Company does not insure titles against mining claims.

"When I entered into the contract of August 16, 1950 with Mr. and Mrs. Wilson, I certainly had no knowledge of the existing mining claim and had no intention of buying any property subject to mining claims. In fact our Contract expressly calls for title insurance against any and every kind of encumbrance except certain conditions and restrictions. Therefore, it appears that what I had in mind to purchase can not be delivered under any circumstances and the express terms of our contract can not be complied with. So, I consider our Agreement of August 16, 1950 to be impossible of performance and declare the action at an end.

"I am forwarding a copy of this letter to Mr. and Mrs. Wilson to give them notice also.

"Yours truly,
"Bert Calvert
By: (Signed) Bert Calvert

"BC:cj
"cc: Mr. & Mrs. Wilson"

This action by plaintiffs for specific performance followed.

The particular ground of objection posed by defendant, as the correspondence shows, was the existence of the mining location. Plaintiffs, through the agency of the Title Company, have paid for and obtained a quitclaim to the mining location, but the litigation has been broadened to cover the exceptions and reservations in the original patents from the Government. The exceptions and reservations are: " * * * there is reserved from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States. Excepting and reserving, however, to the United States all the coal and other minerals in the lands so entered and patented, together with the right to prospect for, mine, and remove the same pursuant to the provisions and limitations of the Act of December 29, 1916, 39 Stat. 862, 43 U.S.C.A. § 299."

■ Defendant's position in the litigation is that the exceptions and reservations

constitute encumbrances within the meaning of the letter contract between the parties, and that the defects cannot be cured. This excuses defendant from performance, his lawyers say. I hold to the contrary.

■ One. Defendant is in the doubtful position of condemning his own title, a title which he has joined in passing to others.[1] This comes close to an estoppel.

■ Two. Ordinarily, all that one can expect or be required to give is a "good title", that is, a merchantable title.

■ Three. This case falls in the category of a known fact or situation, such as a visible right of way. The parties are presumed to have contracted, in the light of the known facts, or as it is sometimes put, with reference to the known facts. The better considered cases treat exceptions and reservations in patents in this way. The cases hold that the provisions of a public statute inhere in every transaction.[2] Williams v. Hefner, 89 Mont. 361, 297 P. 492, 496; Dopps v. Alderman, 12 Wash.2d 268, 121 P.2d 388, Op. by Driver, Justice, now United States District Judge.

■ Four. If there were nothing else, I should think the Arizona statutory definition of "encumbrance" might present a stumbling block to defendant's position.[3]

Defendant appears to have acted as his own lawyer. He drew the letter proposal and he raised the title question. He says in one of his letters he will come over to Arizona from California and locate a mining claim in plaintiffs' back yard. That, I would say, he has a perfect right to do, if the Government patent to the area in which plaintiffs' home is located contained the same reservation of mineral rights as is involved in this litigation, and if the land is mineral in character.[4] However, that does not make the mineral and other reservations in the patents at issue an encumbrance, as known to the law.

In closing, I want to say a word for defendant's lawyers. They have sought valiantly to sustain the position taken by defendant, and if they have been unsuccessful, defendant has only himself to blame. He handed his attorneys, able men, an untenable proposition. There is an old saying that a shoemaker should stick to his last.

Judgment for plaintiffs.

1. Plaintiffs' Exhibit No. 28 shows that six and one-half (6½) tracts averaging 15 to 20 acres each have been sold to third parties at $250 per acre.

2. I practiced law in three locations in Oregon. They were close to the border-lines of three other public land States. I don't recall that I ever saw or heard of a deed being drawn that referred to the exceptions and reservations made in the various public land statutes.

3. " * * * The term 'encumbrances' includes taxes, assessments and all liens upon real property; * * * ". Sec. 71-408, Ariz.Code Ann. 1939.
    But see Fraser v. Bentel, 161 Cal. 390, 119 P. 509, construing a similar California statute.

4. Plaintiffs offered expert testimony that the land involved in the instant litigation is non-mineral in character.